Filed 6/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FLOYD HENSON et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> C. OVERAA & COMPANY, <br><br> Defendant and Respondent. | A139966 <br><br> (Alameda County <br> Super. Ct. No. RG11610366) |

**INTRODUCTION**

This appeal arises out of a dispute over the meaning of certain provisions of the Prevailing Wage Law and Shelley-Maloney Apprentice Labor Standards Act of 1939 (Shelley-Malony Act)[1] relating to the employment of apprentices on public works projects. Floyd Henson, Gabriel Maestretti, and Leonard Minor (appellants) assert that C. Overaa & Company (respondent) violated the statutes by hiring construction craft laborer (laborer) apprentices instead of pipefitter apprentices to work on the construction of certain water treatment plants.[2] Appellants are pipefitter apprentices, and they seek to represent a class of similarly situated individuals who lost wages and training as a result

---

[1] The Prevailing Wage Law is codified at Labor Code section 1770 et seq., and the Shelley-Maloney Act at Labor Code section 3070 et seq. Hereinafter, all statutory references are to the Labor Code unless otherwise specified. All references to the Code of Regulations are to title 8 of that code unless otherwise indicated. Specific regulations are referred to as "Regulation__" and cited as "Reg. § __."

[2] An apprentice is a person who is at least 16 years of age who has entered into a written apprenticeship agreement with an employer or sponsor which provides the apprentice with a program of training and instruction in a particular occupation. (§ 3077.) A journeyman is a person who has completed an accredited apprenticeship program or has equivalent training. (Reg. § 205, subd. (a).)

of respondent's alleged violations. The trial court granted summary judgment in favor of respondent on the ground the journeymen on the relevant projects were classified as laborers, and the Prevailing Wage Law merely required employers to hire apprentices who are in the same occupation as the journeymen on their projects. Appellants assert the trial court erred because the statutes require a contractor to select apprentices based not on their job title or union affiliation but the work processes on which they have been expressly approved to train. We find the argument unpersuasive and affirm.[3]

## BACKGROUND

### A. Legal Background

The Prevailing Wage Law requires that contractors on public works projects pay their employees union wages. (§§ 1770, 1773.) Among other things, the goals of the statute are "to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; [and] to permit union contractors to compete with nonunion contractors." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.) Prevailing wage rates are set by the Department of Industrial Relations (DIR) and are predicated on applicable wage rates established by collective bargaining agreements within the locality and in the nearest labor market, among other factors. (§ 1773.) Where the rates are not prevailing in a locality, DIR must obtain and consider additional data from the labor organizations and employers or employer associations concerned. (*Ibid.*) Prevailing wage rate determinations generally list the scope of work and craft classifications to which the rates apply.

If the Prevailing Wage Law required contractors to pay all employees union wages, it would present a significant obstacle to the hiring and training of lesser-skilled

---

[3] The parties have filed five requests for judicial notice in connection with this appeal. Appellants' May 13, 2014 request has already been granted. We also grant appellants' September 18, 2014 request and February 18, 2015 request, as well as respondent's April 10, 2015 request. Respondent's June 26, 2014 request is denied.

apprentices. (See *Electrical Joint Apprenticeship Com. v. MacDonald* (9th Cir. 1991) 949 F.2d 270, 274.) "The basic idea of an apprenticeship program is to allow on-the-job training for apprentices who work under the supervision of journeymen and thus to encourage and assist persons to enter into the skilled work force . . . . In order for such an apprenticeship program to work, it is essential that the employer be able to pay lesser wages to apprentices while they are in training." (*Ibid.*)

The drafters of the Prevailing Wage Law took these considerations into account. The statute allows contractors to pay an apprentice a lower "apprentice wage" if that apprentice is enrolled in a state-approved apprenticeship program. (§ 1777.5, subds. (b) & (c).) Thus, while the sponsor of an apprenticeship program need not obtain state approval, there are significant financial incentives to do so. (*Southern Cal. Ch. of Associated Builders Etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 428–429.) Further, the statute requires employers who hire workers in an any "apprenticeable craft or trade" to also hire a certain number of apprentices. (§ 1777.5, subd. (d).) Specifically, contractors must hire at least one apprentice for every five journeymen employed on the public works; however, an approved apprenticeship program may grant an exemption under certain circumstances. (§ 1777.5, subds. (g) & (k).) To facilitate training opportunities, the Prevailing Wage Law requires contractors to endeavor to employ apprentices during the same time period that journeymen in the same craft or trade are employed at the jobsite. (§ 1777.5, subd. (h).)

Apprenticeship standards and training are governed by the Shelley-Maloney Act, which provides that the Director of DIR is ex officio the Administrator of Apprenticeship. (§ 3072.) Apprenticeship standards are also administered by two entities under the auspices of DIR: the Division of Apprenticeship Standards (DAS) and the California Apprenticeship Council (CAC). (§ 3070.) The chief of DAS administers the apprenticeship law, acts as secretary to CAC, and is empowered to investigate standards for apprenticeship programs. (§§ 3073, 3090.) Those wishing to establish a

3

state-sanctioned apprenticeship program must submit written apprenticeship standards to DAS for approval. (Reg. § 212). Among other things, the written standards must include a statement of "the occupation(s) and an outline of the work processes in which the apprentice will receive supervised work experience and training on the job." (Reg. § 212, subd. (a)(1).)

CAC meets at the direction of DIR and aids DIR in the formulation of polices for the effective administration of apprenticeship laws. (§ 3071.) CAC is also empowered to issue rules and regulations which establish standards for apprenticeship programs and criteria for the selection procedure of apprentices, among other things. (*Ibid.*) Under the Prevailing Wage Law, contractors who employ workers in any apprenticeable craft or trade must make contributions to CAC, but may take as a credit for payment any amounts paid to an approved apprenticeship program that can supply apprentices to the site of their public works project. (§ 1777.5, subd. (m)(1).)

### B.    *Facts and Procedural History*

Respondent is a general contractor and a signatory to a collective bargaining agreement (CBA) with the Northern California District Council of Laborers (Laborers Union). The CBA requires respondent to employ construction craft laborers represented by the Laborers Union. The CBA also obligates respondent to hire apprentices enrolled in the state-approved apprenticeship program sponsored by the Laborers Union. Whenever possible, respondent must rotate laborer apprentices through different types of work so that they may become trained in a variety of work operations and work skills.

This case arises out of respondent's construction work on dozens of water and sewage treatment systems in Northern California, including those owned by the East Bay Municipal Utility District and the Alameda County Water District. A significant portion of the work on many of these projects involved the installation of sophisticated, three dimensional pipe systems, sometimes referred to as "process piping." Pursuant to the CBA, respondent hired journeymen and apprentice laborers to perform this work.

4

Appellants contend the laborer apprentices hired by respondent were not qualified to work on process piping, though they do not contest respondent's decision to hire laborer journeymen for the projects. The DAS-approved apprenticeship standards for the Laborers Union's apprenticeship program indicate that apprentices receive instruction and training on "[p]ipelaying work traditionally performed by Construction Craft Laborers," as well as "[p]ipeline and utility construction." Appellants' expert opined that pipelaying, as traditionally performed by laborers, bears little resemblance to process piping since pipelaying "is work with a minimum number of engineering and physical constraints . . . and is performed in a two dimensional environment."

Appellants assert that respondent should have instead hired apprentices from an approved pipefitting apprenticeship program, such as the one in which appellants are enrolled. Appellants' program is sponsored by the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (Pipefitters Union), a union with which respondent does not have a collective bargaining agreement. The Pipefitters Union program provides classroom instruction and on-the-job training on process piping, which involves, inter alia, cutting, threading, bending, beveling, welding, and assembling various types of pipe. According to the Pipefitters Union, there are no other DAS-approved programs that offer training and instruction on these process piping skills.[4]

Appellants filed this putative class action against respondent in December 2011, claiming that they lost wages and on-the-job training hours as a result of respondent's refusal to hire pipefitter apprentices. They seek to represent all apprentice pipefitters

---

[4] Appellants also assert that O*NET, a recognized dictionary of occupational definitions and descriptions, demonstrates that the work of pipefitters and laborers involve separate work processes. According to O*NET, the tasks performed by laborers are limited to controlling traffic, preparing construction sites, signaling equipment operators, loading and unloading building materials and equipment, measuring and recording distances to layout areas, digging ditches and trenches, mixing and pouring concrete, tending pumps and related equipment, and erecting and dismantling scaffolding.

5

registered on out-of-work lists in the geographic areas where, and in the time period during which, respondent employed laborers on the projects at issue. Appellants allege that respondent is liable under the Unfair Competition Law because it violated section 1777.5 and other relevant provisions of the Prevailing Wage Law. According to appellants, section 1777.5 requires contractors to hire apprentices who are enrolled in programs approved to train and instruct on the specific tasks that the apprentices will need to perform on the project.

The trial court granted summary judgment in favor of respondent. The court held the Prevailing Wage Law requires contractors which employ journeymen in any apprenticeable craft or trade to also employ apprentices from the same craft or trade. It further held that the term "craft or trade" refers to the journeymen's trade or occupation, not the work processes in which they engage on any given day. The court concluded that respondent had no obligation to hire pipefitter apprentices because it did not hire pipefitter journeymen or other workers represented by the Pipefitters Union.

This appeal followed. Various organizations have filed amicus briefs in support of respondent, specifically: Northern California Laborers' Joint Apprenticeship Training Committee, United Contractors, Construction Employers Association, and Associated General Contractors of California. Among other things, the amici assert this case arises out of a long-running jurisdictional dispute between the Pipefitters Union and the Laborers Union over whether the members of the Pipefitters Union should have the exclusive right to perform process piping work on municipal water plant projects. They also assert a ruling in favor of appellants would force respondent and other contractors to breach their CBAs with various unions.

## DISCUSSION

### A.    *Standard of Review*

Summary judgment must be granted if all the papers and affidavits submitted, together with "all inferences reasonably deducible from the evidence" and uncontradicted

by other inferences or evidence, show "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Where, as here, the defendant is the moving party, he or she may meet the burden of showing a cause of action has no merit by proving one or more elements of the cause of action cannot be established. (*Id.*, subd. (*o*).) The defendant may do so by offering affirmative evidence that negates an essential element of the plaintiff's cause of action or by offering the plaintiff's factually insufficient discovery responses. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1598.) Once the defendant has met that burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact as to that cause of action. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 583.)

We review the trial court's summary judgment determinations de novo. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.) "We are not bound by the trial court's stated reasons or rationale. Instead, we review the summary judgment without deference to the trial court's determination of questions of law. [Citations] We may consider only those facts which were before the trial court, and disregard any new factual allegations made for the first time on appeal." (*Ibid.*)

### B. Plain Language of the Statute

This dispute primarily turns on Labor Code section 1777.5, a provision of the Prevailing Wage Law pertaining to the employment of registered apprentices. In interpreting the statutory provisions at issue, our primary task is to determine the lawmakers' intent. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) To determine intent, we first look to the plain language of the statute. (*Ibid.*) Where the statutory language is clear and unambiguous, that language controls and there is no need for judicial construction. (*Ibid.*) However, that does not mean that we view the language of the statute in isolation. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083.) "Rather, we construe the words of the statute in context, keeping in mind the statutory purpose," and "[w]e will not follow the plain

7

meaning of the statute 'when to do so would "frustrate[] the manifest purposes of the legislation as a whole or [lead] to absurd results." ' " (*Ibid.*)

Turning to the statutory text, subdivision (b) of section 1777.5 states: "Every apprentice employed upon public works . . . shall be employed only at the work of the craft or trade to which he or she is registered." Subdivision (c) states only apprentices training under apprenticeship standards approved by DAS are eligible to be employed at the apprentice wage rate on public works, and that employment and training of each apprentice shall be "in accordance with" either (1) the apprenticeship standards and agreements under which he or she is training, or (2) the rules and regulations of CAC. Under subdivision (d), when a contractor on public works "employs workers in any apprenticeable craft or trade, the contractor shall employ apprentices in at least the ratio set forth in this section and may apply to any apprenticeship program in the craft or trade that can provide apprentices to the site." Subdivision (g) clarifies that "[t]he ratio of work performed by apprentices to journeymen employed in a particular craft or trade on the public work" shall in no case be less than one to five. Subdivision (h) requires the contractor to "endeavor, to the greatest extent possible, to employ apprentices during the same time period that the journeymen in the same craft or trade are employed at the jobsite."

The trial court held the statute requires contractors to hire apprentices in the same craft or trade as the journeyman on a public works project, and the craft or trade of a journeyman should be understood to refer to the journeyman's occupation, not the work processes in which the journeyman is engaged on any given day. Under the trial court's reading, if an apprentice is called a laborer and training in an apprenticeship program sponsored by the Laborers Union, that apprentice is authorized to perform the type of work in which laborer journeymen and other members of the Laborers Union engage. Appellants contend the trial court erred because, under section 1777.5, it is the state-approved written apprenticeship standards that control how a public works contractor

8

must employ and train apprentices, and which apprentices the contractor must hire. Citing to subdivision (c) of the statute, appellants argue "[e]mploying apprentices 'in accordance with' their apprenticeship standards means giving them jobs (and only those jobs) that teach the skills of their apprenticeship programs." According to appellants, only pipefitter apprentices are eligible to work on the relevant projects because DAS has authorized only the Pipefitters Union's apprenticeship program to offer instruction and training on process piping.

We agree with the trial court. The Prevailing Wage Law requires that apprentices on public works projects "be employed only at the work of the craft or trade to which he or she is registered" (§ 1777.5, subd. (b)), and the plain language of the statute indicates an apprentice's craft or trade is defined by the type of work carried out by the journeymen and other members of the union sponsoring the apprentice's training program. Specifically, section 1777.5 repeatedly refers to craft or trade in terms of the type of work performed by journeymen. Section 1777.5 subdivision (d) provides that when a contractor employs workers in an apprenticeable craft or trade, the contractor must also hire apprentices from an apprenticeship program in that craft or trade. Subdivision (g) refers to the ratio of work performed by apprentices to journeymen employed in a "particular craft or trade." Likewise, subdivision (h) states contractors should endeavor to employ apprentices during the same time period the journeymen in the "same craft or trade" are employed at the jobsite. This interpretation is also consistent with regulations promulgated under the Shelley Maloney Act, which state that "[w]ork of the craft or trade consists of job duties normally assigned to journeymen in the apprenticeable occupation." [5] (Reg. 230.1, subd. (c).)

_____

[5] Appellants contend that the definition of "apprenticeable occupation" is key to resolving this dispute. We disagree. The regulations merely define the term to distinguish it from other types of occupations. Specifically, the regulations provide: "An 'Apprenticeable Occupation' is one which requires independent judgment and the application of manual, mechanical, technical, or professional skills and is best learned

9

Under this interpretation, respondent did not violate section 1777.5. The apprentices hired by respondent are enrolled in the Laborers Union's apprenticeship program, which has been approved by DAS, and are training to become laborers. The journeymen on the jobsites identify as laborers and are members of the Laborers Union. Moreover, appellants do not dispute that the members of the Laborers Union hired by respondent are qualified to construct and install process piping on the relevant projects. Thus, it is reasonable to conclude the craft or trade of a laborer encompasses such work processes, and that the apprentices and journeymen hired by respondent share the same craft or trade.

Appellants argue that, notwithstanding their title and union affiliation, the craft or trade of the journeymen and apprentice laborers assigned to the relevant projects differ. In appellants' view, journeymen who install process piping are pipefitters, even if they call themselves laborers and belong to the Laborers Union. But the Prevailing Wage Law does not offer any hard and fast rules concerning how to determine the craft or trade of a journeyman. Rather, it indicates that DIR should defer to the craft classifications adopted by unions in their collective bargaining agreements. Specifically, section 1773 states that a body awarding a public works contract "shall obtain the general prevailing rate of per diem wages . . . for each craft, classification, or type of worker needed to execute the contract from [DIR]." It further states that, "[i]n determining the rates, [DIR] shall ascertain and consider the applicable wage rates established by collective bargaining agreements . . . ." By implication, DIR cannot determine a prevailing rate without considering the craft, classification or type of worker involved. Thus, "the definition of

through an organized system of on-the-job training together with related and supplemental instruction." (Reg. § 205, subd. (c).) Likewise, the Prevailing Wage Law defines "apprenticeable craft or trade" to distinguish the term from other types of crafts or trades that do not require apprenticeship training: " 'Apprenticeable craft or trade,' as used in this section, means a craft or trade determined as an apprenticeable occupation in accordance with rules and regulations prescribed by [CAC]." (§ 1777.5, subd. (d).)

the craft, classification or type of worker is an inherent part of the determination of that craft, classification or type of worker's single proper prevailing rate of per diem wages." (*Sheet Metal Workers Internat. Assn., Local Union No. 104 v. Rea* (2007) 153 Cal.App.4th 1071, 1082 (*Rea*).)[6]

Appellants point out DIR regulations define a journeyman as a person who has "completed an accredited apprenticeship in his/her craft" or "who has completed the equivalent of an apprenticeship in length and content of work experience and all other requirements in the craft which has workers classified as journeyman in the apprenticeable occupation." (Reg. § 205, subd. (a).) According to appellants, this means a journeyman is a person who mastered the set of skills that the state has recognized as defining the apprenticeable craft or trade, and who is therefore qualified to teach new workers who also wish to master that trade. But nothing in the regulation indicates certain skills, such as process piping, may not be mastered by several kinds of journeyman or that a journeyman is limited to performing the work processes on which his or her apprenticeship program has been authorized to train.

Appellants also assert the trial court ignored section 1777.5, subdivision (c), which requires that the employment and training of each apprentice is "in accordance with" either the relevant apprenticeship standards or the rules and regulations of CAC. As they point out, pursuant to regulations promulgated under the Shelley-Maloney Act, apprenticeship standards submitted for DAS approval must include "an outline of the work processes in which the apprentice will receive supervised work experience and

---

[6] Moreover, to the extent that appellants seek to challenge the craft classifications of the journeymen laborers hired by respondent, this is not the appropriate forum. "[A]ny representative of any craft, classification or type of workman," may petition DIR to review a rate determination (§ 1773.4), and by implication the definition of the craft, classification or type of worker to which that determination applies (*Rea*, *supra*, 153 Cal.App.4th at p. 1082). The doctrine of exhaustion of administrative remedies bars any later civil action where a party fails to first request DIR review. (*Id.* at p. 1080.)

11

training on the job, and the allocation of the approximate time to be spent on each major process." (Reg. § 212, subd. (a)(1).) However, apprenticeship standards also include "all the terms and conditions for the qualification, recruitment, selection, employment and training, working conditions, wages, employee benefits, and other compensation for apprentices . . . ." (Reg. § 205, subd. (f).) There is no indication the laborer apprentices at issue were denied proper wages or benefits or were recruited in an improper manner. Rather, appellants merely contend that the apprentices received additional training in processes that were not expressly listed in the laborer apprenticeship standards originally approved by DAS.

We cannot conclude this additional training constituted a violation of the relevant apprenticeship standards, since those standards set a floor, not a ceiling. The Shelley-Maloney Act provides: "Nothing in this chapter or in any apprentice agreement approved under this chapter shall operate to invalidate any apprenticeship provision in any collective agreement between employers and employees setting up higher apprenticeship standards." (§ 3086.) This provision "makes it clear that the Shelley-Maloney Act was not intended to operate as a comprehensive and exclusive means of regulating apprenticeship programs. Rather, given its voluntary nature and its express allowance for higher standards, it is clear the Shelley-Maloney Act was only intended to set minimum apprenticeship standards which individual programs are free to supplement." (*Associated General Contractors of America v. San Diego Unified School Dist.* (2011) 195 Cal.App.4th 748, 761.) Thus, respondent was free to train laborer apprentices in work processes beyond those set forth in the apprenticeship standards approved for the Laborer Union's program. Appellants argue this reading of the statute cannot be squared with Regulation 212, which states that "[i]n order to be approved, [apprenticeship] standards must cover all work processes within the apprenticeable occupation." But

12

Regulation 212 merely pertains to the approval process for apprenticeship standards; it does not expressly limit the type of work in which an apprentice may engage.[7]

Appellants also argue CAC endorsed their interpretation of section 1777.5 in a recent resolution, issued after the judgment of the trial court, which states in relevant part: "[T]he Council confirms that Labor Code section 1777.5 requires public works contractors to employ apprentices who are training under apprenticeship standards that include the specific work processes that will be performed by the contractors' journey-level employees, and to assign apprentices only work that is included in the apprenticeship standards under which the apprentices are training. Apprentices on public works cannot be assigned work other than that which is stated in the work processes of the apprenticeship standards under which the apprentices are training." (CAC Res. on Employment of Apprentices on Public Works, affd. at regular CAC meeting, Oct. 30, 2014.)

As respondent points out, the CAC enacted this resolution to address an issue different from the one presented by this case. Specifically, the resolution was prompted by complaints from a pipefitter training coordinator that public works contractors were assigning pipefitter apprentices work outside of their program's work processes.[8] The

---

[7] We also observe that appellants could have brought an administrative challenge concerning the relevant apprenticeship standards. The Shelley-Maloney Act provides that "[u]pon the complaint of any interested person . . . the administrator may investigate to determine if there has been a violation of the terms of an apprenticeship agreement . . . ." (§ 3081.) Determinations of the administrator may be appealed to CAC (§ 3082), and CAC's decisions are subject to judicial review (§ 3084). Further, under DIR regulations, appellants could have filed a complaint with DAS alleging noncompliance with section 1777.5, including "fail[ure] to properly employ apprentice(s) by assigning apprentice(s) to perform work outside the craft or trade of the apprenticeable occupation . . . ." (Reg. § 231, subd. (a)(6)(C).)

[8] The coordinator's complaints were set forth in a letter to the CAC. Appellants argue we should not take judicial notice of the letter because it is not an official act of the CAC. As appellants point out, courts have declined to take judicial notice of letters submitted to an administrative agency that are not part of the agency's decision. (See

coordinator's complaint was referred to a CAC committee on rules and regulations, which held a meeting on the issue. At the committee meeting, speakers from other apprenticeship programs reported similar problems. One speaker explained how a plumber apprentice had been employed full-time as a truck driver and backhoe operator. Nothing in the record suggests the CAC was concerned about the selection of apprentices by public works contractors, the primary issue on appeal. Rather, the CAC focused on the specific tasks to be assigned to apprentices after they have been selected by a contractor.

Appellants argue the CAC resolution is clear and unambiguous, and thus there is no need to look beyond its text to determine its meaning and the meaning of section 1777.5. We disagree. The weight to be accorded administrative interpretations, such as the one set forth in the CAC resolution, "turns on a legally informed, commonsense assessment of their contextual merit." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14.) Specifically, the deference due to the resolution " 'will depend upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . .*' " (*Ibid.*, quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140.) We therefore cannot consider the text of the resolution in a vacuum. Since the CAC's resolution addresses a question distinct from the one presented by this appeal, its interpretation of section 1777.5 is entitled to little deference. That the resolution was promulgated while this litigation was ongoing and was prompted by

---

*Citizens Utilities Co. v. Superior Court* (1976) 56 Cal.App.3d 399, 411.) However, in this case, the coordinator's letter was the impetus for the CAC's action. Moreover, the letter is expressly discussed in CAC documents that were the subject of appellants' request for judicial notice. Appellants also argue the letter and other agency materials contained in respondent's request for judicial notice set forth an incomplete and misleading account of CAC's deliberations. However, appellants have made no attempt to introduce other records that would support a different interpretation of CAC's intent in enacting the resolution.

complaints from individuals associated with the Pipefitters Union further undermines its persuasive value.

For these reasons, we find that the plain language of the Prevailing Wage Law and Shelley-Maloney Act support the trial court's finding that respondent was not required to employ pipefitter apprentices for the relevant projects.

### C.    Legislative History

When the plain meaning of the text does not resolve a question of statutory interpretation, we may examine extrinsic sources, including the statute's legislative history.  (*Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736, 741.)  To the extent that there is any ambiguity in the plain language of the Prevailing Wage Law and Shelley-Maloney Act, the legislative history does not support appellants' interpretation of the statutes.  As appellants point out, since the statutes were first enacted in the 1930s, the Legislature has vested increasing authority in state agencies to regulate the specific content of apprenticeship programs by enacting the statutory provisions discussed above.  However, appellants have pointed to nothing in the legislative history, such as prior amendments, committee reports, or floor debates, that directly address how the term "craft or trade" should be defined in the context of section 1777.5.  In any event, we need not look to the legislative history as the statutory text is clear.

### D.    Other Interpretive Aids

Where the plain language and legislative history do not resolve ambiguity in a statute, then we apply "reason, practicality, and common sense to the language at hand." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc*. (1992) 6 Cal.App.4th 1233, 1239.)  "If possible, the words should be interpreted to make them workable and reasonable [citations], in accord with common sense and justice, and to avoid an absurd result." (*Ibid.*)

To the extent that such interpretative aids are necessary in this case, they weigh against adopting appellants' view of the statute.  As the trial court held, appellants'

15

interpretation "would threaten the onerous and potentially unworkable burden of requiring contractors to inventory, for every journeyman deployed to a public work, the work processes that s/he will actually utilize on each day of the project, in order to determine the extent of the contractor's apprenticeship requirements. This is much less practical than simply calculating hiring needs based upon the number of hours budgeted for Laborers, Plumbers, . . ., etc. in each phase of the project."

Appellants argue that there is no evidence in the record to support this conclusion. But the trial court was merely exploring the logical implications of appellants' view of the statute. The Prevailing Wage Law requires contractors to endeavor, "to the greatest extent possible," to employ apprentices during the same time period as journeyman in the same craft or trade. (§ 1777.5, subd. (h).) If, as appellants contend, a journeyman's craft or trade is defined exclusively by the work processes that he or she is carrying out, that journeyman's craft or trade can vary from moment to moment. This would also mean that a contractor might need to constantly rotate apprentices to match the craft or trade being performed on the jobsite. We agree with the trial court that appellants' reading of the statute has the potential to place an unreasonable burden on contractors.[9]

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

---

[9] Moreover, as amici point out, many contractors have entered into collective bargaining agreements obligating them to hire only apprentices enrolled in programs sponsored by particular unions. Adopting appellants' interpretation of the Prevailing Wage Law could force these contractors to make a difficult choice: violate the statute or breach their collective bargaining agreements.

16

_____

Dondero, J.

We concur:

_____

Margulies, Acting P. J.

_____

Banke, J.

A139966

17

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Steven A. Brick |
| Counsel for Plaintiffs and Appellants | Davis, Cowell & Bowe, LLP<br>  John J. Davis, Jr.<br>  Andrew J. Kahn<br>  Eric B. Myers<br>Wohlner Kaplon Phillips Young & Cutler<br>  Jeffrey L. Cutler |
| Counsel for Defendant and Respondent | Cook Brown LLP<br>  Ronald W. Brown<br>  Barbara A. Cotter<br>  Stephen R. McCutcheon, Jr.<br>Law Office of James P. Watson<br>  James P. Watson |
| Counsel for Amicus Curiae<br>Northern California Laborers' Joint<br>Apprenticeship Training Committee<br>on behalf of Defendant and Respondent | Weinberg, Roger & Rosenfeld<br>  Barry E. Hinkle<br>  Roberta D. Perkins<br>  Conceptión E. Lozano-Batista |
| Counsel for Amicus Curiae<br>United Contractors<br>on behalf of Defendant and Respondent | Simpson, Garrity, Innes & Jacuzzi, PC<br>  Paul V. Simpson |
| Counsel for Amicus Curiae<br>Construction Employers Association<br>on behalf of Defendant and Respondent | Lawrence H. Kay |
| Counsel for Amicus Curiae<br>Associated General Contractors<br>on behalf of Defendant and Respondent | Cox, Castle & Nicholson LLP<br>  John Stonewall Miller, Jr.<br>  Dwayne P. McKenzie |